Filed 6/7/22  M.G. and T.S. v. Superior Court CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| M.G. and T.S.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, et al.,<br><br>        Real Parties in Interest. | A164320<br><br>(Contra Costa County Super. Ct. No. J1900702) |

Petitioners M.G. (father) and T.S. (mother) each seek extraordinary writ relief from the juvenile court's orders terminating reunification services and setting a Welfare and Institutions Code[1] section 366.26 hearing as to their now seven-year-old daughter, A.G. Both parents challenge the court's jurisdictional findings on the subsequent petition, visitation orders, and the termination of services. Mother additionally argues that the court made erroneous, or failed to make necessary, findings at disposition. Having

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

reviewed these extended proceedings in detail, we agree with mother that the record does not support the jurisdictional finding that she failed to protect A.G. from father's physical abuse, but otherwise see no error requiring reversal. We therefore deny father's petition, and grant in part and deny in part mother's petition.

## BACKGROUND

### Original Petition

On August 2, 2019, the Contra Costa County Children and Family Services Bureau (Bureau) filed a petition under section 300, subdivision (b) with respect to then three-year-old A.G. It alleged that father, mother's former pimp, had a history of domestic violence with mother; the parents continued to violate a then standing restraining order protecting mother and A.G. from father; both parents struggled with substance abuse; father had a firearm, ammunition, and methamphetamine that was accessible to A.G.; and father had a fire in his bedroom while A.G. was in his care.

As detailed in the Bureau's detention report, police responded to father's residence in June based on a report that a fire had broken out in his bedroom while A.G. was in his care. The police discovered a firearm, ammunition, and methamphetamine, which were all accessible to A.G. Father was arrested, and A.G. was detained and placed in mother's home.

The Bureau also reported mother and father began dating in 2012, and mother had worked as a prostitute from some time in 2017 to approximately January 2019 under father's direction. At the time of the report, a restraining order had been issued against father. However, neither parent had been honoring the restraining order. Father frequently went to mother's home, where he verbally abused her in front of A.G. Mother was afraid father "would treat [A.G.] like he has treated [mother]." The Bureau further reported father had a criminal history, which included a prior conviction for

2

forgery, as well as prior arrests for forgery and child endangerment. Both parents also admitted to using methamphetamine in the past.

On August 5, 2019, the court detained A.G. from father's custody, ordered that she remain in mother's custody, and granted supervised visitation to both parents.

On October 3, 2019, the Bureau informed the court that father had recently snuck into mother's home, took A.G. and mother's purse while mother was in the kitchen, and left the house. Mother's adult son[2] and his friend chased after father. When they were able to get into father's car with him and A.G., a struggle ensued, and father began assaulting the men with a billy club. Mother retrieved A.G. the next day after receiving a call from father's mother, S.S., asking mother to pick up A.G. Due to father's "dangerous" and "reckless" conduct, the Bureau recommended that all contact with father be suspended.

On November 19, 2019, another restraining order prohibiting father from contacting mother and A.G. was issued, and visitation for father was suspended.

On January 16, 2020, the court held a jurisdiction hearing, at which mother and father pleaded no contest to an amended petition containing essentially the same allegations as the initial petition filed in August 2019. The court set a disposition hearing for February 6, 2020.

In its disposition report, the Bureau wrote that the parents began dating in 2012 and separated in 2018 due to domestic violence and emotional abuse perpetuated by father. Mother admitted she had problems with

_____

[2] Mother has two sons. Her adult son lived with her, and there is no information regarding his father. Mother's other son from a prior relationship was 15 years old at the time and lived with his father.

3

marijuana and last used methamphetamine in January 2019 and cocaine some time in 2018. Father admitted to marijuana use but denied having substance abuse issues or ever using methamphetamine.

The Bureau also reported that at the August 5, 2019 detention hearing, the parents received referrals for substance abuse treatment, drug testing services, and parenting education. Mother also was referred to a domestic violence support group, and, father, to individual counseling and anger management. Mother participated in substance abuse treatment and attended her support group meetings. Father initially participated in substance abuse treatment but stopped due to his work schedule. Of 24 scheduled drug tests during the reporting period, mother failed to appear on 10 occasions and tested positive for marijuana on five occasions. Similarly, father missed all but one of his scheduled drug tests. The Bureau formulated case plans for both parents.

The Bureau recommended that the court adjudge A.G. a dependent and order that mother receive family maintenance services and that father receive reunification services under mother's plan. At the February 6, 2020 disposition hearing, the court adopted the Bureau's recommendations and set a review hearing for July 23, 2020.

**Supplemental Petition**

In a March 2, 2020 memorandum, Sophia Webb, the social worker assigned to the case, reported that when she met with mother and A.G. on February 27, A.G. stated she saw father "that day." Both father and mother, however, denied they had contact with each other.

Additionally, at the meeting, mother appeared to be under the influence of substances. Mother recently tested positive for amphetamine and methamphetamine. When confronted with these results, mother denied using drugs. She then stated she had used her son's ADHD medication,

4

which she claimed could have produced the positive test results. Mother eventually admitted she used methamphetamine on February 21. Mother then expressed her feelings of depression and exhaustion, before stating she was going to kill herself if A.G. were removed from her care. She proceeded to blame her drug use on others or attempted to justify it. Due to her threats of self-harm, police were called, and when they arrived, mother repeated her plans to harm herself. As a result, mother was detained and transported to a hospital for a psychiatric evaluation, and A.G. was placed in an emergency foster home.

During the reporting period, mother's attendance in her substance treatment program had been sporadic. Mother also received referrals for therapy and was encouraged to enter a residential treatment program, but she failed to take advantage of either one. Between October 2019 and February 2020, mother missed several drug tests and tested positive on one occasion. The Bureau also learned that mother had not been taking A.G. to school and speech therapy regularly.

On March 3, 2020, the Bureau filed a supplemental petition under section 387 seeking modification of A.G.'s current placement with mother by removing her from mother's custody. A detention hearing was held that same day, at which the juvenile court detained A.G. and scheduled a jurisdiction hearing.

In its jurisdiction report, the Bureau noted A.G. was placed in a licensed foster home where she had been thriving. Initially, A.G. was afraid to interact with the foster family, especially the males, namely the foster

father and son.[3]  A.G. also had fears of taking baths and did not want to take off her clothes.  But after three weeks, A.G. began feeling comfortable with the members of the home and enjoying baths.

The Bureau also reported that father continued to violate the restraining order.  In early April, father attempted to gather information about mother from the foster parents during video visits with A.G. and use A.G. to pass messages along to mother.  Father also obtained the foster parents' address and phone numbers and texted them directly.  Later that month, father went to mother's house while she was away and was allowed inside by her son.  Mother denied being in a relationship with father and maintaining contact with him. In May, mother also reported that father threatened her then boyfriend to give him money, and hacked into the boyfriend's email and obtained information in order to "blackmail" him.  The foster family experienced similar harassing behavior, though they could not identify the source.  Their email and PayPal accounts were hacked, someone had tried to buy products with their account information, and they received an online request for cash.  The foster family grew concerned for their safety and installed a home security system.

The Bureau wrote it was "very concerned that [father] has continued to have contact with [mother].  Neither has abided by the restraining order." The Bureau went on, "It is difficult for [it] to believe that [father] was not involved in both incidents" concerning mother's boyfriend and the foster family, given that father's criminal history included fraud-based offenses.

The Bureau received an application from father's mother, S.S., to have

---

[3] The Bureau's reports use the terms "caregiver" or "caregivers" interchangeably with "foster (mother or father)" or "foster family."  We will refer to the caregivers as the "foster family" or "foster (mother or father)."

A.G. placed in her home.  S.S. stated she did not know the original petition allegations regarding father's possession of a firearm, ammunition, and methamphetamine that was accessible to A.G.  S.S. also was unaware of father's drug use.  S.S. believed that mother's drug use was the reason for A.G.'s placement in foster care.  She also expressed that father did not have anger issues until he became involved with mother.  S.S. also did not know that father had previously abducted A.G.  Given S.S.'s lack of knowledge of father's behaviors and placement of blame on mother, the Bureau expressed concern that father would continue to violate the court orders if A.G. is placed with S.S.

The Bureau credited mother for her participation in services, but remained concerned that she continued to allow father to interfere in her life. The Bureau also observed that father continued to blatantly violate court orders and the restraining order.  The Bureau recommended that family maintenance services to mother be terminated, and that reunification services be offered to both parents.

On July 30, the court held the disposition hearing, where the Bureau informed all parties that A.G. had recently raised allegations that father had physically and sexually abused her and that an investigation had been initiated.  The court suspended visitation for father pending the outcome of the investigation.

The court otherwise adopted the Bureau's recommendations in its disposition report.  It prohibited mother and father from contacting the foster family or A.G. and further ordered that A.G. may not be placed with her paternal grandmother.  The court set a contested placement hearing on October 1 and a six-month review hearing on January 14, 2021.

**Subsequent Petition**

On October 14, 2020, the Bureau filed a subsequent petition under

7

section 342 (hereafter "subsequent petition"), which alleged new facts, other than those under which the original petition was sustained, that A.G. fell within the provisions of section 300, subdivisions (a), (b)(1), and (d). Specifically, the subsequent petition alleged that (1) "The father struck the child on her arms, head, legs, and chest with his open hand"; (2) "The child has suffered physical harm as a result of the mother's failure or inability to supervise or protect the child from the father's physical abuse"; (3) "The child is afraid to visit with her father because 'he yells and screams like a dinosaur,' hit her with an open hand, and 'hurt her tickle spot' (vagina) with his finger"; (4) "The father touched the child's vagina with his finger and touched the child's buttocks with his hand"; and (5) "The mother failed to protect the child from inappropriate touching by the father in that she suspected father had sexually abused the child, but chose not to investigate her suspicions or take measures to protect the child."

On November 5, 2020, the Bureau outlined the results of its investigation as follows. On July 28, 2020, the foster mother reported that while transporting A.G. to a visit with father, A.G. said her father was mean to her and she did not want to visit him. A.G. said she was afraid of father "because he roars like a lion" and "hit her on her face, head, back, and arm." A.G. demonstrated how she was hit by opening her hand and swinging it. A.G. then said, " 'Daddy touches my butt . . . and my tickle spot too.' " When asked by the foster mother where her "tickle spot" was, A.G. pointed to her vagina.

On July 29, 2020, social worker Webb went to the foster family's home, where A.G. was interviewed. Webb showed A.G. a drawing depicting the front and back outlines of a young girl, before asking her the name of the various parts of the body that Webb pointed at. A.G. was able to identify the

8

nose, arm, feet, and eyes. After explaining to A.G. the difference between "good touch" and "bad touch," Webb asked A.G. if anyone ever hurt her. A.G. became upset and sad, and left the table.

A.G. eventually returned and was able to identify the color of her hair and lips. Webb again asked A.G. if she had been hurt, and she nodded her head, indicating that she was. When asked how, A.G. opened her hand, spread her fingers wide and swung it, and stated her "daddy" hit her. Webb gave A.G. a crayon and asked her to use mark where on the drawing father had hit her. A.G. colored the arm, head, hand, leg, and chest. Webb asked A.G. if anyone else had hit her, to which A.G. replied, her mother and brother.

After discussing "bad touch" and asking if anyone had touched her, A.G. became quiet, seemed sad, and nodded yes. When asked who touched her, A.G. said, "my daddy" and then turned her hand up and made a hook with her forefinger. Webb placed the drawing in front of A.G. and asked her to point to the area where the touch happened. She pointed to and touched the vaginal area on the drawing. A.G. was given a crayon again and asked to color where the "touch" happened. A.G. colored the vagina and stomach area.

On August 6, 2020, Amanda Johnson, the Bureau's emergency response social worker in charge of the investigation, interviewed A.G. A.G. often shut down and did not answer questions. However, A.G. did state that father was "like a dinosaur" because he yelled and screamed. Johnson showed A.G. a copy of the drawing that Webb showed her during the prior interviews. A.G. said, "That's me." When asked why she colored certain parts of the drawing in purple, A.G. explained that those are the areas where father hit her with an open hand. Johnson asked A.G. about the area circled by the crotch area on the drawing, and A.G. stated that was her "tickle spot." In order to ensure

9

A.G. was not referring to her belly button, A.G. was asked to point to her "tickle spot." A.G. then pat her crotch area and the crotch area of the foster mother. The foster mother asked A.G. to identify her bottom, and A.G. pat her bottom while stating "butt" and laughing. A.G. stated that the hitting and touching occurred at "her mother and father's house."

On October 15, 2020, a forensic interview of A.G. was scheduled at the Children's Interview Center (CIC). However, because A.G. was scared and unable to provide any information about the abuse, the police and Bureau ended the interview and decided not to put her through a second one.

A combined pretrial conference and six-month review hearing was scheduled for January 14, 2021. The court also set a contested jurisdiction hearing based on the new allegations in the subsequent petition for February 3, 2021 and February 4, 2021.

In a January 14, 2021 status report, the Bureau noted that A.G. had been receiving therapy from Dr. Leslie Hilp of We Care Services, who diagnosed her with PTSD. Dr. Hilp reported that in October 2020, A.G. was experiencing escalating, regressive behaviors, such as urinating on herself, smearing feces at school, and reverting to a " 'baby' " state, which may have been caused by the rapid changes and actions in her life, namely recent telephone calls and visits with her paternal grandmother and aunt. A.G. was unable to provide information regarding what specifically triggered and caused her pain; she literally could not speak at all, indicative of an extreme state of anxiety.

During the reporting period, mother continued to participate in services, attended individual therapy, and obtained negative drug test results. Father, on the other hand, did not show up for drug testing.

The Bureau recommended that A.G. remain a dependent and that the

court find, by clear and convincing evidence, that reasonable services were provided to the parents and that the return of A.G. to her parents would create a substantial risk of detriment to her safety, protection, or physical or emotional well-being. It also recommended continuing family reunification services to both parents. At a combined pre-trial and six-month review hearing on January 14, 2021, the court adopted the Bureau's recommendations and set the 12-month review hearing for April 15, 2021.

### *Jurisdiction Hearing*

The jurisdiction hearing on the subsequent petition was held over the course of five days in early 2021: February 3, February 4, April 15, April 22, and April 28. Social workers Webb and Johnson and father testified as witnesses.

On February 3, 2021, the juvenile court admitted into evidence recordings of A.G.'s CIC interview. At the beginning of the interview, A.G. was scared, clingy, and reluctant to participate. A.G. eventually sat down for the interview, but still appeared nervous. She demonstrated she knew the difference between the truth and a lie when she responded it was a lie when the investigator told her that a green stick she was holding was blue. The investigator attempted to elicit information about the abuse from A.G., but she was not responsive. A.G. at times gave unclear answers and replied "I don't know" to several questions. She also mentioned stories about her foster brother giving her a "boo" on her knee and her foster sister going to "jail." She did not elaborate upon either of these stories. A.G. also responded "no" when asked if she felt safe with the foster father and brother, but when asked why, stated, "I don't know."

At the hearings on February 3 and 4, 2021, Webb testified about her July 28, 2020 and July 29, 2020 interviews of the foster mother and A.G. concerning the physical and sexual abuse allegations. The diagrams that

11

Webb showed to A.G., and that A.G. had marked to identify where on her body she was hit or touched, were admitted into evidence.

When questioned about A.G.'s use of the term "daddy" to describe who had hurt her, Webb testified she did not ask A.G. during the initial interviews if "daddy" was father. Webb further testified that she had observed A.G.'s interactions with her foster father on four or five occasions, during which A.G. seemed "very happy" to see him and expressed physical affection by running up to him and hugging his leg. However, A.G.'s interactions with father, were different. Webb testified that she observed about 10 of their visits and that A.G. was "very reluctant to visit with [father]" and did not express any physical affection toward him.

Webb also shared mother's disclosures about father's sexually deviant acts. In one particular incident, mother and father were engaged in sexual acts, when father went into another bedroom and ejaculated in the presence of mother's roommate. The roommate later "told [mother] that she needed to be watching [A.G.] around [father]." When mother asked father about this, he became very upset, and mother "let it go."

Additionally, Webb testified she asked mother whether A.G. was physically disciplined, and mother replied that she, father, and her older son all had struck A.G. in the past.

While the jurisdiction hearings were ongoing, the Bureau prepared a review report dated April 15, 2021. A.G. had been attending both individual therapy and parent/child therapy. Parent/child therapy consisted of A.G. and the foster mother sharing joint sessions together, in which Dr. Hilp advised the foster mother on how to help A.G. when she presented negative behaviors. Dr. Hilp found it difficult to treat A.G. during the reporting period because of her aversion to telehealth. She refused to engage in sessions, ran

away, and had emotional meltdowns. A.G. demonstrated similar behaviors during virtual sessions with her behavioral specialist. The specialist grew concerned that "too many people were involved in the case" and were potentially overwhelming A.G., and that the services were overlapping. Thus, behavioral services were suspended, and A.G. was recommended to continue with both individual and parent/child therapy.

Amber Pierre, another therapist of We Care Services had been providing mother with parent/child therapy since October 2020, sessions of which mother attended alone. The Bureau requested that A.G. and mother begin to attend therapy together with Ms. Pierre with the goals of A.G. building trust in her mother's ability to keep her safe, and mother understanding A.G.'s PTSD diagnosis and recognizing the specific triggers that may lead to A.G.'s dysregulation and anxiety.

The Bureau reported mother "seems more confident and able to take actions that will ensure her child's safety," "is able to demonstrate that she understand how her life choices and actions have affected her daughter, [A.G.]," and "recognizes that her priority is to keep [A.G.] safe." The Bureau thus found "[t]he prognosis of [A.G.] returning to [mother] is excellent."

Father was referred to have a psychological evaluation to address his risk of engaging in sexual misconduct in the future. Once the evaluation was completed, he would then receive a further evaluation and any treatment recommendations. Father met with Dr. Cindy Mataraso, who then agreed to provide the evaluation at a fee of $5,000. Given the high cost, the Bureau opted for father to receive the evaluation through the county's mental health department at no cost to the Bureau. Father was placed on a waitlist for the evaluation.

On April 21, 2021, the Bureau submitted another report, informing the

13

court that Webb interviewed A.G. again on March 24 and asked her to clarify whether father was the person who hurt her. A.G. stated, "yes, he hurt my butt." When asked if the foster father or foster brother hit her, A.G. said no.

Webb also wrote that she had asked the foster parents about A.G.'s statements during her forensic interview that her foster brother hurt her and her foster sister "went to jail." The foster mother was unsure why A.G. would state that her son was not nice to her. However, the foster mother explained that A.G. was not bonded to the son, as she was afraid of males initially and did not interact with males socially. The foster father also stated that his relationship with A.G. was "okay." Initially, A.G. would not respond to the foster father, but after some time living in the home, she warmed up to him. A.G. was very attached to the foster mother and daughter. With respect to the statement about the foster sister going to jail, it was revealed that it was in reference to a game that the children played together.

There were also reports that on April 14 and 19, mother received phone calls and text messages from an unknown phone number and found gifts for A.G. or items left on her doorstep. Mother believed father was responsible for the messages and items and reported the incidents to both the Bureau and police out of fear for her and A.G.'s safety.

On April 22, Johnson testified about her investigative interview of A.G. in August 2020. Johnson also recalled that the foster mother related her concern that A.G. inappropriately had touched both her and the foster mother's vaginal area. Johnson testified she also had witnessed A.G. do the same thing in front of her during the interview.

Father testified that he had never struck A.G. or touched her vagina or buttocks in an inappropriate way. He also denied ever having loud verbal arguments with mother in A.G.'s presence. Father additionally testified,

14

"I can't specify any one particular act that caused her to be removed from her mother's care." Minor's counsel then asked, "I'm asking about removing from your care. . . . [W]hat are the facts, as you understand them, that contributed to the child being removed from your care?" Father replied, "Technically, I don't feel she was ever removed from my care."

On April 28, the final day of the jurisdiction hearing, the court heard argument from the parties. Father urged dismissal of the subsequent petition, arguing that A.G.'s statements regarding the abuse were not reliable. The other parties argued father's testimony was not credible and there was sufficient evidence to sustain the abuse allegations. As to mother, counsel for the Bureau and mother argued there was insufficient evidence to support the allegations that mother failed to protect A.G. from father's physical and sexual abuse.

Following that argument, the court stated it did not find father's testimony credible. In contrast, it found A.G.'s statements credible, explaining that "the nature in which the minor explained how she was struck, and where she was struck, and her visual diagram . . . that was consistently referred to on, I believe, three of those interviews. Albeit not the CIC . . . I agree. But I do find that to be credible." The court thus sustained the allegations in the subsequent petition of physical and sexual abuse as to father.

With respect to the allegations against mother, the court sustained count b-1 alleging A.G. suffered "physical harm" as a result of the "mother's failure or inability to supervise or protect the child from the father's physical abuse." The court highlighted the fact that mother had "continually violated the terms of [the] protective orders" and allowed father to have access to A.G. The court, however, dismissed the allegation that mother failed to protect

15

A.G. from sexual abuse.

The court set a contested 12-month review hearing, to be combined with a contested disposition hearing on the subsequent petition, for June 30 and July 1.

### *Combined Disposition and 12- and 18-Month Review Hearing*

On or around June 30, 2021, the Bureau submitted its report in connection with the disposition hearing on the subsequent petition.[4] Since April 28, 2021, mother had been receiving unsupervised and overnight visitation. According to mother, the visits overall went well. However, on several occasions, A.G. was "very difficult to handle" and became dysregulated, as evidenced by her temper tantrums, refusal to take directives, and emotional meltdowns.

The foster mother also reported that days after visits with mother, A.G.'s behavior regressed. She began cutting her hair, marking up furniture and her clothes, slamming her bedroom door, reverting to baby talk, sticking out her tongue, and kicking the family dog.

It was further reported that on May 18, A.G. told her teacher that father came to her birthday and that he would be picking her up the coming Monday; they ate cake and pizza by the trampoline; father sang "Happy Birthday" to her in mother's house; they hung out in the backyard; father was by the bounce house; and mother, father, and her foster family were there. A.G.'s teacher reported this to the foster mother, who was unaware that father came to the birthday party. On the way home from school, the foster mother related to A.G. what she heard from her teacher. A.G. responded that

---

[4] The disposition report is actually dated July 1, and was filed on December 1. However, on the first day of the combined disposition and review hearing on June 30, the court stated it had received and reviewed the report.

"daddy" played with her, that they ate grapes and pizza, and that she was going to see her father three days from then. A.G. added that she rode in a car with father, and that mother went to his house and picked him up and brought him to the party.

The foster mother informed the Bureau that since the birthday party, A.G. refused to sleep her in bed and feared the dark. She also went lay down in the foster parents' bed, which she had never done before.

On May 19, the Bureau interviewed A.G., who stated she was happy to see her father at the birthday party. When asked if she had been told not to tell the foster mother or the Bureau that she had seen father, A.G. answered "yes." The interview ended when A.G. stated she no longer wanted to talk and was scared. Approximately two minutes later, A.G. had an emotional meltdown.

Father, mother, and the paternal grandmother and aunt all denied that father went to the birthday party. The grandmother proceeded to explain she did not believe her son physically and sexually abused A.G. and that A.G. made up the story that her father was at the party because she missed him. Concerning visitation, the grandmother admitted A.G. did not want to visit her, but nonetheless requested visitation. The aunt also requested virtual visits with A.G., despite being informed that virtual visits caused A.G. negative emotional responses. The Bureau arranged for weekly telephone calls between the paternal relatives and A.G. A.G. either did not participate, ignored the relatives, or said she was "done" and left the telephone. A.G. also was resistant to attending in-person visits with the relatives. The Bureau observed the paternal relatives minimized A.G.'s feelings of discomfort and her PTSD diagnosis during the visits. It thus concluded that the paternal relatives have "disregarded therapeutic recommendations, showing more

17

concern with their own access to [A.G.], than . . . [her] best interests."

The Bureau also remained "very concerned with the fact that [mother] is extremely challenged with setting and keeping boundaries . . . involving [father] and the paternal family." As for father, he continued to receive individual therapy, but failed to submit any drug tests between April and June. The Bureau thus recommended that services for mother be continued, and that services for father be terminated.

The contested and combined 12-month review and disposition hearing took place over the course of several days between June 30, 2021 and January 3, 2022. Because of the passage of time, the 12-month review hearing had morphed into the 18-month hearing as of August 27, 2021.[5]

At the hearings on June 30, July 1, and August 4, 2021, social worker Webb, the foster mother, and mother testified. According to Webb, A.G. "had a level of mistrust with mom." Based on reports from A.G.'s therapist, Webb testified that A.G. did not feel safe with mother. A.G. continued to experience high levels of anxiety and that any changes in her life caused her fear. It was unclear what triggered A.G.'s regressive behaviors; however, the therapist believed "it ha[d] something to do with the paternal relatives being present at this birthday party. . . . [M]om is a piece of that and it might be just because mom allowed these relatives to monitor her alone." Consequently, Webb testified that A.G. needed to work on building safety and trust back with mom, which could potentially be achieved through A.G. attending individual therapy and parent/child therapy together with mother. Webb also related the therapist's opinion that it was not in A.G.'s best interests to have contact with father or the paternal relatives.

---

[5] By the time the hearing concluded on January 3, 2022, there were fewer than 60 days left before the 24-month review.

Webb further testified her belief that mother would not be able to care for A.G. if she is returned to her full time at the 18-month mark because A.G. did not feel safe with her and was still working on stabilizing her mental health. Webb "doubt[ed] very seriously" that mother "would be able to address [A.G.'s] needs as well as build on this parent/child bond . . . that's needed for [A.G.] to feel safe with mom because right now she absolutely positively [does] not feel safe with her mom."

The foster mother testified that when she arrived at A.G.'s birthday party, she was sitting with her paternal grandmother and aunt. Also, after the birthday party, A.G. stated before visits with mother that she did not want to visit with mother. The foster mother had to bribe A.G. with toys or food to get her to go to the visits. Before one visit, A.G. cried and said, "I don't want to see my mom." Before another visit, A.G. threw temper tantrums, and threw herself on the floor and would not exit the door. When the foster mother came to pick her up from the visit, A.G. ran up to the foster mother and said, "Let's go. I'm ready to go."

Mother testified she was instructed by social worker Webb not to leave A.G. unsupervised with her paternal relatives at her birthday party. Despite receiving this instruction, mother left the party for some period of time to run an errand. However, she asked her mother beforehand to watch A.G. and did not intend to leave A.G. with the paternal relatives. Mother also claimed she did not see any concerning behaviors from A.G. after the party. She also testified that she did not know that A.G. was having a hard time with visiting her until hearing the foster mother's testimony.

On September 15, 2021, the Bureau submitted another report that responded to mother's testimony that she had no knowledge of A.G.'s negative behaviors after her party. The Bureau outlined two meetings it had

with mother in June and September, when A.G.'s regressive behaviors were discussed with mother in detail.

As also mentioned in the report, on August 15, 2021, mother gave A.G. an album containing photos from her birthday party. A.G., however, hid the album in the furniture of the foster family's home. A.G.'s therapist expressed that although the gift may have been well-intentioned, mother lacked the ability to recognize A.G.'s cues and triggers and did not seem to accept A.G. had PTSD.

On September 14, 2021, the clinical supervisor and mental health director of We Care Services sent a letter to the Bureau summarizing A.G.'s history and progress in therapy.[6] Mother began attending parent/child therapy individually in late 2020, before attending sessions together with A.G. in August and September 2021. During sessions with mother, A.G. "appeared to be tense, bossy and controlling, and had a hard time engaging with her mother and the therapist." The clinicians wrote that it was probably confusing for A.G. to begin therapy with mother after being used to attending therapy with the foster mother. As the clinicians observed, due to A.G.'s trauma history, she became upset, anxious, and overwhelmed when exposed to abrupt changes in her life. Thus, she required "very gradual transitions with ample support." Although the clinicians found it beneficial to continue therapy with mother and A.G., they opined that "returning [A.G.] to her biological mother's custody now, abruptly and without sufficient gradual support for child, . . . mother, and foster family, would create a substantial risk of detriment to [A.G.'s] emotional well-being."

---

[6] The Bureau would later explain that though it submitted the letter separately from the September 15, 2021 report, it was intended to be an attachment to that report. The court thus deemed the clinicians' letter to be an attachment to the September 15 report.

On November 10, 2021, the Bureau submitted another report stating that on September 7, mother had tested positive for amphetamine and methamphetamine. When confronted, mother gave conflicting responses. She first stated the test sample was not hers and later that the test was a false positive, before again stating the testing lab had mixed up her sample. Mother also claimed she tested positive because she had taken cold medication due to an ear infection. But when asked if she had seen a doctor for the ear infection, mother stated she did not have one but took the cold medication to prevent one.

In late September 2021, mother texted the foster mother that she was feeling suicidal.[7] Specifically, she wrote: "I want to die and am wanting to hurt myself"; "I will kill [father]" and "I want him dead"; "I hate Sophia [Webb] and I wish bad things upon her . . . and all those people in the department"; and "I will never take full responsibility for any of my daughter[']s mental health problems Sophia and the county are a huge part of it." The foster mother contacted police and requested that they conduct a welfare and safety check on mother.

Webb asked mother about these incidents. Mother stated she went to a friend's house and did not go the hospital for a psychiatric evaluation following the police's welfare check, despite telling the police she would do so. Mother also blamed the Bureau for taking A.G. from her and the state of her mental health. Webb observed that mother's erratic behavior coincided with the positive test for methamphetamine.

On October 4, 2021, mother notified Webb that she contacted the

---

[7] The text messages were not attached to the November 10 report and were separately submitted to the court. The court later deemed the text messages as an attachment to that report.

testing lab and was told that one of her medications could result in a false positive, but not was not told which medication. Mother gave Webb information about her medications. On October 12, Webb received a hair follicle test result from mother, which test yielded a negative result for amphetamine. However, it was later discovered that mother did not have the lab test for methamphetamine. On October 23, the Bureau had mother retested. On October 28, the lab was provided with a list of mother's medications. The lab found that none of the medications would cause a false positive test for amphetamine or methamphetamine. And it reported that the levels in mother's urine sample were consistent with the use of street methamphetamine.

As to father, the Bureau reported that he continued to miss drug tests. He also received a psychological evaluation on September 2 through the county's behavioral health department. According to the evaluator, father denied all sexual abuse allegations and having a history of domestic violence or substance abuse. Father also falsely told the evaluator that the court was going to terminate the sustained allegations of sexual abuse against him.

The foster parents notified the Bureau that their car had been vandalized on multiple occasions, and unauthorized attempts were made to charge their Amazon account and log into their social media and money transfer accounts.

On November 10, 2021, Webb testified regarding mother's recent positive drug test results and text messages to the foster mother, which were admitted into evidence. Mother also testified, admitting she was detained for a psychiatric evaluation and emergently transported to a hospital after she sent the foster mother text messages that she would harm herself and others, testimony that conflicted with her prior statement to the Bureau that she

22

went to a friend's house instead of a hospital following the welfare check.

In light of recent events, Webb testified she did not believe mother had truly "learned anything from two and a half years of services." In Webb's view, mother lacked insight into the reasons as to why A.G. was removed from her care. Therefore, Webb recommended against increasing mother's contact with A.G. while she was in her frame of mind. Webb further opined that mother lacked a protective capacity towards her child, and that it thus would not be safe to return A.G. to her.

On December 23, 2021, the parties rested on the evidence and presented argument. The matter was continued to January 3, 2022 for further argument.

At the hearing on January 3, father moved to reopen evidence in light of the foster parents' recent request to have A.G. removed from their care. The court permitted father to call the foster mother as a witness. She testified that on November 15, 2021, she notified the Bureau that she wanted A.G. removed from her home due to incidents of vandalism and harassment towards her and her family, including the flattening of her car's tires, damaging of her home's security systems, and unauthorized access into accounts. The foster mother testified that her request was purely due to concerns about A.G.'s safety. The foster mother, however, testified that she ultimately withdrew her request on the same day that she submitted it.

The court then heard further argument from the parties. Following that argument, the court made the following findings: that A.G. would remain a dependent; by clear and convincing evidence, the Bureau provided reasonable services to mother and father; by clear and convincing evidence, the return of child to mother or father would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of

23

A.G.; by clear and convincing evidence, there was a substantial danger to A.G.'s physical health and/or her emotional well-being were she to be returned to her parents; and there was not a substantial probability that A.G. would be returned to mother's or father's custody safely, even if services were provided. Reunification services were terminated as to both parents. Mother was granted monthly supervised visitation. The court found that contact and visitation with father would be detrimental to A.G. and thus prohibited contact and visitation. The court set a permanency planning hearing under section 366.26 for April 28, 2022. We subsequently stayed that hearing pending our consideration of the petitions.[8]

## DISCUSSION

### Father's Writ Petition

#### *Jurisdiction*

Father's first argument is that insufficient evidence supports the juvenile court's section 300 jurisdictional findings against father predicated on his sexual and physical abuse of A.G. as alleged in the subsequent petition. We disagree.

Section 300 begins: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court . . . ." Then follow several subdivisions describing children who may be adjudged dependents of the court. The Bureau alleged that A.G. came within three of these subdivisions: subdivision (a) ("The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted

---

[8] The Bureau later filed an opposition, which appears to address only mother's writ petition.

24

nonaccidentally upon the child by the child's parent"); subdivision (b) ("The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of [his or her] parent . . . to adequately supervise or protect the child"); and subdivision (d) ("The child has been sexually abused, or there is substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code[9], by [his or her] parent").

The Bureau had the burden of proving by a preponderance of the evidence that the child is a dependent under section 300. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) Here, the juvenile court found the Bureau had met this burden and thus sustained the allegations that father physically and sexually abused A.G. and exercised jurisdiction pursuant to section 300, subdivisions (a), (b), and (d).

Father contends that A.G.'s out-of-court statements regarding his alleged sexual and physical abuse, though admissible, were unreliable and therefore cannot provide substantial evidence to support the jurisdictional findings. "In a juvenile dependency proceeding, a child's out-of-court reports of parental abuse are admissible in evidence regardless of whether the child is competent to testify in court." (*In re I.C.* (2018) 4 Cal.5th 869, 875 (*I.C.*).) However, when out-of-court statements are made by a child who is too young to separate truth from falsehood (sometimes referred to as a truth-incompetent child), our Supreme Court has held that, unless they bear " 'special indicia of reliability,' " a juvenile court may not base its findings solely on such statements. (*Ibid.*; *In re Lucero L.* (2000) 22 Cal.4th 1227,

_____

9 Sexual abuse is defined to include "sexual assault," which, in turn, includes "[t]he intentional touching of the genitals or intimate parts . . . of a child . . . for purposes of sexual arousal or gratification." (Pen. Code, § 11165.1, subds. (a), (b)(4).)

1247–1248.) "[U]ltimately the question is simply whether the ' "time, content and circumstances of the statement provide sufficient indicia of reliability" ' to support the juvenile court's jurisdictional finding, considering the important interests at stake." (*I.C.*, *supra*, 4 Cal.5th at p. 890.)

"[A] reviewing court . . . must consider whether the record as a whole provides substantial evidence to support a determination that the child's statements bear special indicia of reliability." (*I.C.*, *supra*, 4 Cal.5th at p. 892.) Under this standard, " 'we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' [Citations.]" [Citation.]' " (*I.J.*, *supra*, 56 Cal.4th at p. 773.)

In *I.C.,* our Supreme Court held that the hearsay statements of a truth-incompetent, three-year-old child were insufficient to support the jurisdictional finding because the statements did not show a special indicia of reliability. (*I.C.*, *supra*, 4 Cal.5th at pp. 893–896.) The court noted the case was an "unusual situation in which the child recently had been molested" by a third party, whom she encountered for the first time since the abuse a few days prior to making "strikingly similar" allegations against her father.

26

(*Id.* at p. 896.) The court concluded that the trial court "failed to take adequate account of the confounding role of I.C.'s prior molestation," and the spontaneity and details of I.C.'s allegations were less compelling than they otherwise would be. (*Id.* at p. 892.) It explained there was "no adequate basis to support an implied finding" of reliability when "I.C. was not telling the truth at several points during the interview" and "inconsistencies and inaccuracies . . . were woven through her core allegations." (*Id.* at pp. 895–896.) "[F]or example, I.C. asserted that she had a naked encounter with Father, her stepsister RJ, the babysitter, and the babysitter's sister. As the juvenile court noted, these statements were 'not believable.' As for the 'core allegation' that Father put his penis on her, I.C. also stated that Father put a train and a flower on her, that a penis is the same thing as a train, and that she had seen Father '[p]ut penis in the flower and the train and train.' As the juvenile court acknowledged, these statements were 'very confusing' and again suggested that I.C. might be recalling the July incident in which [the third party] used a toy train" during her prior molestation. (*Id.* at p. 893.)

Although father argues this case is factually similar to *I.C.*, we conclude otherwise. Here, there were no unusual circumstances undermining the reliability of the statements of then five-year-old A.G. No allegations of sexual or physical abuse of A.G. were made prior to the subject allegations against father, such that A.G. could have been confused by a prior incident. Also, A.G.'s statements about the incidents of abuse were neither demonstrably false nor confusing. To the contrary, they were consistent and showed she was able to tell fantasy from fiction. A.G. described father's conduct to three separate individuals—the foster mother and the Bureau's two social workers—each time telling the same story. A.G's statements also were detailed and specific. She stated that father "hit her on her face, head,

27

back, and arm" and touched her "butt" and "tickle spot"; showed understanding of the various parts of her body; pointed to the areas of her own body where she was hit or touched; pointed to, and marked on, a diagram containing an outline of a young girl's body to the parts where she was hit or touched; and demonstrated with physical gestures the manner in which she was hit or touched—behavior a five-year-old child should not otherwise know. Simply put, this case does not contain the type of inaccuracies presented in *I.C.*

Father nonetheless argues A.G. had several "inconsistencies" in her statements. He first points to A.G.'s statements that she saw him at or around the time of her birthday party, despite mother and others denying having seen father at the party. But A.G.'s statements pertain to events that occurred after the jurisdiction hearing. Therefore, they are irrelevant and do not support father's assertion. (See *In re T.V.* (2013) 217 Cal.App.4th 126, 133 [in determining whether a child falls within the provisions of section 300, the juvenile court considers the circumstances at the time of the jurisdiction hearing].)

Father next refers us to A.G.'s statement that father touched her "tickle spot" at both her mother's house and father's house, a statement he suggests was false because the parents lived separately, and a restraining order prohibited father from going to mother's house. This argument lacks merit. Father admitted to having violated the restraining order by going to mother's house on numerous occasions. Also, the fact that the parents lived separately actually makes A.G.'s statements that she was abused at both parents' homes plausible.

Father also points out that A.G. referred to her abuser as "daddy," a term she used to describe both father and the foster father, to suggest she

confused the two individuals. However, father ignores evidence that A.G. was able to distinguish between father and her foster father, that when asked if father specifically was the person who hurt her, and that she denied that her foster father and brother hurt her.

Finally, father argues that during her forensic interview, A.G. made inconsistent statements or statements that individuals other than father hurt her and she did not feel safe with them. Although A.G. did state she did not feel safe with her foster brother and foster father, we do not think this evidence eviscerates her reliability. The record shows that A.G. was fearful of the male gender and had to spend significant time with her foster father and brother before she was able to feel comfortable around them. Also, A.G.'s statement that her foster brother hurt her knee does not render her statements about father's abuse inherently false, as it is plausible that both events could have occurred. Further, we acknowledge that A.G. was fearful, reluctant, and as father's attorney put it, "obviously very uncomfortable" at the interview, and her unclear or non-responsive answers reflected that. However, as the *I.C.* court noted, "[a] child's account may reflect uncertainty, and may even contain some contradictions, and nevertheless warrant the court's trust." (*I.C.*, *supra*, 4 Cal.5th at p. 896.) Indeed, the juvenile court expressly acknowledged that A.G. did not provide information about the abuse in the forensic interview, but nonetheless found that her consistency in the prior three interviews rendered her credible.

Viewing the record as a whole and through the lens of the deferential standard of review, we conclude there is substantial evidence that A.G.'s hearsay statements regarding father's physical and sexual abuse of her are sufficiently reliable. (See *I.C.*, *supra*, 4 Cal.5th at p. 892.) This holding, in turn, justifies the juvenile court's jurisdictional findings against father.

*Visitation*

Father next challenges the juvenile court's decision at the combined disposition and review hearing on January 3, 2022 not to award him visitation because it would be detrimental to A.G. He argues there was no basis for "finding that [visitation] was detrimental to the child." Again, we disagree.

Section 366.21, subdivision (h) provides that when a court sets a hearing under section 366.26, "it shall order the termination of reunification services to the parent" and "shall continue to permit the parent . . . to visit the child pending the hearing unless it finds that visitation would be detrimental to the child." "Detriment is a . . . standard that depends on the context of the inquiry. . . . It cannot mean merely that the parent in question is less than ideal. . . . Rather, the risk of detriment must be *substantial*, such that [the proposed action] represents some danger to the child's physical or emotional well-being.' [Citation.]" (*In re A.J.* (2015) 239 Cal.App.4th 154, 160.)

While a visitation order is reviewed pursuant to a deferential abuse of discretion standard (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558), we review the juvenile court's finding that visitation would be detrimental for substantial evidence. (*In re A.J.*, *supra*, 239 Cal.App.4th at p. 160.)

The record contains more than ample evidence demonstrating that visitation with father would be detrimental to A.G. For one, there were substantiated allegations that father physically and sexually abused A.G., a finding that we conclude was supported by substantial evidence. Putting aside those allegations, other evidence showed A.G. was afraid of father, did not want to visit him, and shut down emotionally when asked about him. In addition, father made minimal progress in his case plan and refused to accept responsibility for A.G.'s dependency. Father maintained that he did not have

30

a substance abuse problem and failed to report to scheduled drug testing so many times throughout the case that the court "stopped keeping track." Father also denied ever being verbally or physically abusive towards mother, testifying he had never raised his voice at her. Father also took the position that A.G. was not removed from his, but rather mother's, care. As the Bureau's counsel argued, father "was incapable of describing even one way that his behavior had contributed to [A.G.'s] removal." Based on the totality of these circumstances, the juvenile court could reasonably find that visits between A.G. and father would present a danger to A.G.'s physical or emotional well-being.

Father's contrary arguments are unavailing. He first asserts no evidence demonstrated that visitations would be detrimental to A.G. because there were no recommendations from A.G.'s therapist against visitation. Father is incorrect. As the social worker testified at the combined disposition and review hearing, A.G.'s therapist opined that in light of A.G.'s regressive behaviors following her birthday party in May 2021, it was not in her best interests to have contact with father or the paternal relatives. Father also argues he was entitled to visitation because past visits went well. Even if that were true, father ignores the other, ample evidence described above demonstrating visitation with him would be detrimental.

Father also mentions in passing that "the Bureau delayed in getting [his] evaluation . . . which was prejudicial to [him]." Father, however, does not support this assertion with legal argument, authority, or record citations, allowing us to treat the point as forfeited. (*In re A.C.* (2017) 13 Cal.App.5th 661, 672–673.) Forfeiture aside, the claim fails on the merits. Presumably, father is referring to the Bureau's recommendation after the jurisdiction hearing that he undergo a psychological evaluation to assess his risk of

31

committing sexual misconduct.  While there was some delay, it was not prejudicial.  Any benefit gained from the evaluation was lost when father, during his evaluation, denied the abuse allegations, his domestic violence history, and substance abuse and falsely stated that the court would dismiss the abuse allegations.

Accordingly, substantial evidence supports the juvenile court's finding that visitation with father would be detrimental to A.G.  There was no abuse of discretion in declining to grant father visitation.

### *Continuance*

Father's final argument is that "extraordinary circumstances based upon a lack of reasonable services warrant a continuance of services to [him] pursuant to section 352."  We reject this argument.

" 'Although continuances are discouraged in dependency cases' [citation], the juvenile court has authority to grant brief, necessary continuances that are not inconsistent with the child's best interests, while giving 'substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.' " (*In re Abbigail A.* (2016) 1 Cal.5th 83, 95.)  "Continuances in juvenile dependency proceedings are disfavored, particularly when they infringe on maximum time limits under the code." (*In re David H.* (2008) 165 Cal.App.4th 1626, 1635.)

As noted above, delays and continuances in this case caused the 12-month review hearing to merge with the 18-month review hearing.  " 'The 18-month hearing represents a critical juncture in dependency proceedings. [Citations.]  At the 18-month hearing "critical" decisions concerning parental rights are made.  [Citations.]  The Court of Appeal has held: "The Legislature has determined that the juvenile court must embrace or forsake

32

family preservation at this point by circumscribing the court's options." [Citation.] The minor must either be returned to the physical custody of his or her parent or the court must terminate reunification services.' " (*In re J.E.* (2016) 3 Cal.App.5th 557, 563–564.)

"It is, however, within the court's discretion under section 352 to continue the 18-month review hearing and extend reunification services up to 24 months upon a showing of good cause. [Citations.]" (*In re J.E., supra,* 3 Cal.App.5th at p. 564.) Good cause to continue services beyond 18 months has been shown to exist where "the services offered [were] defective in some way" (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1465) or there were "extraordinary circumstances 'involv[ing] some external factor which prevented the parent from participating in the case plan.' " (*Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1510, citing *Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, 1388, superseded by statute on another ground as stated in *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1504; *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 (*Elizabeth R.*).)

We review a juvenile court's refusal to grant a continuance pursuant to section 352 for abuse of discretion. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180; *Andrea L. v. Superior Court, supra,* 64 Cal.App.4th at p. 1388.)

Father contends the court abused its discretion in declining to continue services at the combined disposition and review hearing on January 3, 2022 because the Bureau failed to provide him with adequate services. Father does not dispute that during the reunification period, the Bureau offered him services in the areas of substance abuse treatment, individual therapy, parenting education, and domestic violence classes. Instead, he claims he was not given reasonable services in the form of visitation. Father's

argument under section 352 is essentially a restatement of his argument challenging the court's finding that visitation would be detrimental to A.G. We already rejected those arguments. Rather than a failure by the Bureau to provide reasonable services, it was father's own failure to take advantage of services and strenuous denial of wrongdoing that prevented him from reunifying with A.G. As the court in *Earl L. v. Superior Court*, *supra*, 199 Cal.App.4th at page 1505 stated, "It defies common sense to continue reunification efforts for a parent who has made minimal efforts throughout a case."

### Mother's Writ Petition

Mother raises six claims of error, which she asserts under two main headings: "Twelve/Eighteen-Month Review Issues," followed by "Subsequent Petition Issues." We address mother's arguments in the order in which they are presented in her petition.

### *Review Hearing Issues*

### Finding of Substantial Detriment

Mother's first argument is that insufficient evidence supports the juvenile court's finding at the combined disposition and review hearing that returning A.G. to mother's custody would create a substantial risk of detriment to A.G.'s physical or emotional well-being. We disagree.

" 'Under the current dependency scheme, except in limited circumstances, a parent is entitled to 12 months of reunification services, with a possibility of 6 additional months, when a child is removed from a parent's custody. (§ 361.5.) The juvenile court must review the case at least once every six months. (§ 366.) At the dispositional hearing, and at each review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody. . . . At . . . 12–[] and 18–month review hearings the juvenile court must return the child

34

to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being. (§§ 361, subd. (b), 366.21, subds. (e) & (f), 366.22, subd. (a).)" (*M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 659–660 (*M.G.*).) The burden to prove this is squarely on the Bureau. (*Id.* at p. 660.)

"In determining whether it would be detrimental to return the child at the 18–month review, the court must consider whether the parent participated regularly in any treatment program set forth by the plan, the 'efforts or progress' of the parent, and the 'extent' to which the parent 'cooperated and availed himself or herself of services provided.' (§ 366.22, subd. (a).)" (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748 (*Blanca P.*).) Thus, it is insufficient for the juvenile court to consider "the mere completion of the technical requirements of the reunification plan." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141.)

"[T]he easy cases are ones where there is a clear failure by the parent to comply with material aspects of the service plan . . . for example, a mother continued to test positive for illegal drug use, continued to move from place to place, failed to 'regularly' attend therapy, and failed to complete her parenting class. This was obviously enough to support a finding of detriment. [¶] The harder cases are . . . where the parent has complied with the service plan, but for some reason has not convinced a psychologist or social worker that it would be safe to return the child to the parent. The problem is not, as it were, quantitative (that is, showing up for counseling or therapy or parenting classes, or what have you) but qualitative (that is, whether the counseling, therapy or parenting classes are doing any good)." (*Blanca P.*, *supra*, 45 Cal.App.4th at p. 1748, italics omitted.)

Relevant factors a juvenile court can consider in making its detriment finding include "whether changing custody will be detrimental because severing a positive loving relationship with the foster family will cause serious, long-term emotional harm [citations]; properly supported psychological evaluations which indicate return to a parent would be detrimental to a minor [citations]; . . . [and] limited awareness by a parent of the emotional and physical needs of a child [citation] . . . ." (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704–705 (*Constance K.*).)

We review the court's detriment determination for substantial evidence. (*M.G.*, *supra*, 46 Cal.App.5th at p. 660.)

The Bureau and juvenile court correctly observed that mother participated in and completed components of her case plan. However, as the Bureau asserts, despite mother's participation in reunification services for over 28 months, events that occurred in the seven months before the disposition hearing supported the detriment finding.

The Bureau first discusses events related to A.G.'s birthday party in May 2021, when A.G. stated she saw father at her birthday party. While there was a dispute as to whether it A.G.'s statements were true, the following evidence was unassailable: Mother left the party at some point, and during her absence, A.G. was left with the paternal relatives; that after that party, A.G.'s behaviors significantly regressed, illustrated by, for example, her having emotional meltdowns, cutting her hair, smearing feces at school, coloring and cutting her clothes, and clinging to the foster parents; that A.G. did not want to visit with mother after the events in her birthday party and exhibited negative behaviors before or after the visits; and that mother gifted A.G. an album containing photos from her birthday party, to which A.G. responded by hiding the album in the foster family's furniture.

36

As the social worker testified, A.G. did not feel safe with mother and "had a level of mistrust with [her]." Also, while A.G.'s therapist reported to the Bureau she did not know exactly what triggered A.G.'s regressive behaviors, she believed "it ha[d] something to do with the paternal relatives being present at this birthday party. . . . Mom is a piece of that and it might be just because mom allowed these relatives to monitor her alone." Further, A.G.'s therapist opined mother lacked the ability to recognize A.G.'s cues and triggers or accept her PTSD.

Next, the Bureau points to evidence that in September 2021, shortly after the 18-month mark, mother relapsed into methamphetamine use. Rather than admit to using, mother, as the Bureau put it, "lied about it extensively and in a very committed way." She either denied it or attempted to justify it, and even obtained another test to clear her name. Although that test result was negative for amphetamines, it was later revealed that mother did not have the lab test her for methamphetamine.

In addition, the Bureau cites to evidence of mother's emotional and mental instability that coincided with her relapse. Specifically, it points to the texts that mother sent to the foster mother stating she wanted to hurt herself, she will "kill" father, the Bureau and social worker "all deserve to die," and she "will never take full responsibility for any of my daughters [*sic*] mental health problems Sophia and the county are a huge part of it."

Finally, the Bureau refers us to A.G.'s fragile emotional state, which was documented by her clinicians. In addition to A.G.'s regressive behaviors immediately following her birthday party in May 2021, the evidence also showed A.G. did not engage well with mother during their joint parent/child therapy sessions in August and September 2021. A.G. "appeared to be tense, bossy and controlling, and had a hard time engage with her mother and the

37

therapist." The clinicians ultimately opined that although it would be beneficial to continue therapy with mother and A.G., "returning [A.G.] to . . . mother's custody now, abruptly and without sufficient gradual support for child, . . . mother, and foster family, would create a substantial risk of detriment to [A.G.'s] emotional well-being."

We agree with the Bureau that based on all of the above evidence, the juvenile court could and did reasonably conclude that returning A.G. to mother's care would create a substantial risk of detriment to A.G.'s emotional well-being.[10] First, although mother participated in substance abuse treatment and counseling throughout the proceedings, she failed to resolve her long-standing drug problem and mental and emotional health issues. Second, mother demonstrated "limited awareness . . . of the emotional . . . needs of [A.G.]" by failing to recognize A.G.'s emotional cues and triggers and PTSD diagnosis. (*Constance K.*, *supra*, 61 Cal.App.4th at p. 705.) Mother also continued to believe she did not play a role in A.G.'s emotional and mental condition. Third, A.G. expressed fear and mistrust of mother and regressed behaviorally in connection with visits. Fourth, the court had before it a "properly supported psychological evaluation[] which indicate return to [mother] would be detrimental to [A.G.]" (*Ibid.*) This was based on the clinicians' assessment that A.G. was emotionally fragile, given her history of trauma, and thus did not respond well to abrupt changes in her life.

---

[10] The court made the detriment finding by clear and convincing evidence, rather than the preponderance of the evidence standard required under the statutes governing the 12- and 18-month review hearings. (§§ 366.21, subd. (f), 366.22, subd. (a).) Mother does not challenge the application of the clear and convincing standard. In any event, we would conclude she was not prejudiced by it, since satisfaction of the heightened standard would satisfy the lower preponderance of the evidence standard.

These examples of mother's behavior, particularly while under the watchful eyes of the Bureau and the juvenile court, along with A.G.'s severe emotional frailty, illustrate the substantial risk of harm that mother posed to A.G. if returned to mother's care.

Mother's arguments do not convince us otherwise. Relying on *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495 (*Rita L.*), mother asserts her relapse does not support a finding of substantial risk of harm if A.G. were returned home. In *Rita L.*, the mother, who had an extensive history of substance abuse was doing well with her case plan, had been sober until she took a Tylenol with Codeine tablet prescribed for her daughter to treat a headache. (*Id.* at pp. 498, 499.) The mother immediately told the drug-testing center, her Alcoholics Anonymous sponsor, and the social worker that she took the tablet. (*Id.* at p. 501.) The juvenile court disbelieved that mother's relapse was unintentional and thus terminated reunification services and set a section 366.26 hearing. (*Rita L.*, *supra*, at pp. 502–504.) The appellate court granted the mother's writ petition, observing that not all relapses are equal and not all dirty tests are the same. (*Ibid.*) The court concluded the mother's "ingestion of a single prescription [painkiller] to combat a headache—in the absence of any prior listing of prescription drug abuse—was simply insufficient to justify the court's conclusion that [the child] could not be safely returned to her custody." (*Id.* at p. 506.)

This case is easily distinguishable. The mother in *Rita L.* did not use her drug of choice, immediately reported her mistake, and took steps to address the relapse. (*Rita L.*, *supra*, 128 Cal.App.4th at p. 501.) Here, in contrast, mother used her drug of choice and either denied or tried to justify her drug use. Also, unlike in *Rita L.*, where there was no evidence that the mother's ingestion of the painkiller presented a substantial danger to the

minor's safety or well-being, mother's relapse in this case was accompanied by erratic behavior and threats of self-harm and harm to others.

This leads us to mother's assertion that the text messages do not establish a risk of harm because they reflected a parent who merely was "drained and scared of losing her child." She also asserts "it was not unreasonable for [mother] to attribute part of A.G.'s distress to the Bureau's action." While mother understandably was fraught with emotions throughout these proceedings, to infer that the Bureau is to blame for A.G.'s removal is unreasonable. The Bureau consistently provided mother with many tools to help her reunify with A.G. However, mother ultimately engaged in acts reflecting a belief that she was an ongoing victim in this case, preventing her from addressing the problems that led to A.G.'s initial removal from her care.

Mother also disagrees with A.G.'s clinicians' opinion that "returning [A.G.] to . . . mother's custody now, abruptly and without sufficient gradual support for child, . . . mother, and foster family, would create a substantial risk of detriment to [A.G.'s] emotional well-being." Mother argues that because A.G. responded well to mother's visits in the past, it can be inferred that A.G. would be able to transition back into mother's care if supportive services are put in place. As the Bureau asserts, however, mother ignores evidence that A.G. was resistant to, and showed regressive behavior in connection with, visits with mother following her birthday party in May 2021. In effect, mother is asking us to reweigh the evidence with respect to the clinicians' assessment of the severity of A.G.'s condition, evidence which the juvenile court considered and credited. We decline mother's invitation. (See *I.J., supra,* 56 Cal.4th at p. 773.)

In sum, substantial evidence supports the juvenile court's finding that

returning A.G. to mother's custody would create a substantial risk of detriment to A.G.'s safety, protection, or physical or emotional well-being.

**Continuance**

Mother also argues that the juvenile court abused its discretion in declining to extend services beyond the 18-month period under section 352. According to mother, "[a]t the contested review, the juvenile court erroneously believed that due to the posture of the case, the only basis on which it could continue reunification efforts was a finding that the Bureau had failed to provide reasonable reunification services." She thus faults the court for not considering whether to continue the matter under section 352 "based on extraordinary circumstances."

Mother has waived this argument by acquiescing to the error she now complains of. (See *In re N.M.* (2011) 197 Cal.App.4th 159, 168.) During closing argument, mother's counsel requested that the court grant her additional time to participate in services. The court interjected and asked counsel, "Do you agree that the only way I can grant additional time would be to find reasonable services have not been offered?" Counsel replied, "Yes, Your Honor." In light of mother's agreement with the court's application of the relevant law, mother's argument that the court failed to consider whether "extraordinary circumstances" supported a continuance "is counterintuitive to legal principles of forfeiture and waiver, which are based on maxims of jurisprudence. '[Sh]e who consents to an act is not wronged by it.' (Civ. Code, § 3515; see also Civ. Code, § 3516 ['Acquiescence in error takes away the right of objecting to it'].)" (*In re N.M., supra*, 197 Cal.App.4th at p. 168.) As such, mother has waived the right to raise her section 352 arguments.

Even assuming there was no waiver, mother's contention fails. As explained above, good cause to continue services beyond 18 months pursuant to section 352 has been shown to exist where "the services offered [were]

41

defective in some way" (*Renee J. v. Superior Court, supra,* 96 Cal.App.4th at p. 1465) or there were "extraordinary circumstances 'involv[ing] some external factor which prevented the parent from participating in the case plan.' " (*Denny H. v. Superior Court, supra,* 131 Cal.App.4th at p. 1510.)  For example, in *Elizabeth R.*, the reviewing court affirmed the juvenile court's exercise of discretion to continue an 18-month review hearing in order to provide a parent who had been offered reasonable services with six additional months of reunification services.  This was because the case involved the "unusual circumstance" of the mother being hospitalized for all but five months of the 18–month reunification period. (*Elizabeth R., supra,* 35 Cal.App.4th at p. 1777.)  In *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1216, the family reunification services provided to a mentally disabled parent "in the last 12 months of the reunification stage were virtually nil—a 'disgrace' as the trial court put it."  And in *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777, "no reunification plan was ever developed for [the parent]."

Here, in contrast to the cases above, mother received reasonable family reunification services, and she does not contend otherwise.  The failure of the case plan was not caused by inadequate services or an external force over which mother had no control.  Rather, as detailed in our discussion of the court's finding of substantial detriment, the failure of mother's reunification plan was caused by mother's relapse into methamphetamine use, emotional and mental instability, lack of insight into A.G.'s emotional and mental health needs, and failure to accept accountability for any of the above.  The juvenile court reasonably could conclude there were no extraordinary circumstances or special needs that existed to support an extension of family reunification services beyond the statutory limit.

**Visitation**

Mother's third argument is that the juvenile court erred in decreasing

visitation from once per week to once per month, which contention we review for abuse of discretion. (*In re S.H., supra,* 197 Cal.App.4th at pp. 1557–1558.)

Mother argues "[t]here was no showing in this case that the changes in visitation imposed . . . were necessary to protect A.G. or serve her best interests." Mother then asserts that although A.G. sometimes showed hesitance to see her, she appeared happy to see mother during visits and wanted to see her. That may be true. However, as discussed above, other interactions with mother after May 2021, were met with strong, negative emotional responses and dysregulation. As a result, A.G.'s clinicians opined that it was in A.G.'s best interests that she be allowed "to adjust to *gradual* transitions in visitation schedule and to develop a stronger relationship with her . . . mom *over time.*" (Italics added.) Under these circumstances, decreasing the frequency of A.G.'s visits with mother was reasonably calculated to protect A.G.'s mental and emotional well-being and was not an abuse of discretion.

### *Subsequent Petition Issues*
### Jurisdiction

Mother contends there is insufficient evidence to support the exercise of jurisdiction over A.G. under section 300, subdivision (b) based on the allegation in the subsequent petition that mother failed to protect A.G. from father's physical abuse.[11] Although not raised by either party, we first address whether mother's claim is justiciable.

As a general rule, a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the other findings. (*In re Alexis E.* (2009) 171 Cal.App.4th 438,

---

[11] The Bureau does not address this argument in its opposition to the petition.

43

451.) Thus, the juvenile court's assumption of jurisdiction on the subsequent petition can be affirmed based solely on the sustained allegations regarding father's infliction of sexual and physical abuse, which allegations mother does not challenge. We nonetheless retain discretion to consider the merits of a parent's challenge to a jurisdictional finding (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1493), and often do so when the finding "(1) serves as the basis for dispositional orders that are also challenged on appeal (see, e.g., *In re Alexis E.*, *supra*, at p. 454); (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction.' " (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763; see *In re Madison S.* (2017) 15 Cal.App.5th 308, 328–330; *In re Briana V.* (2015) 236 Cal.App.4th 297, 308–311.)

Here, the challenged jurisdictional finding does not "serve[] as the basis" for the challenged aspects of the juvenile court's disposition order. As explained in the next section, disposition would be justified even if the subsequent petition did not allege mother's failure to protect A.G. from father's physical abuse. This is because the factual bases necessary for sustaining the allegation of mother's failure to protect under section 300, subdivision (b) are not the same as the factual bases necessary for the court's disposition order terminating reunification services and continuing the removal of A.G. from mother's care. The basis of the disposition order was events that occurred after May 2021 and thus had little to do with the sustained allegation against mother.

However, because the jurisdictional finding that mother failed to protect A.G. from physical abuse or the risk of physical abuse by father has the potential to impact current or future dependency proceedings, we exercise

our discretion to consider mother's claim on the merits. (Cf. *In re L.O.* (2021) 67 Cal.App.5th 227, 237–238 ["Findings that Father 'knowingly or negligently' harmed the child or exposed him to a substantial risk of physical harm are 'pernicious' and ' "could potentially impact the current or future dependency proceedings" ' "], citing *In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.)

As discussed above, the failure-to-protect statute allows for a jurisdictional finding when the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child . . . ." (§ 300, subd. (b)(1).) "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm. [Citations.] . . . '[T]here must be some reason to believe the acts may continue in the future.' [Citations.]" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, fn. omitted, abrogated on another point by *In re R.T.* (2017) 3 Cal.5th 622, 629; accord, *In re James R.* (2009) 176 Cal.App.4th 129, 136.) Jurisdiction does not require a "finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child." (*In re R.T., supra,* 3 Cal.5th at p. 624.)

Again, in reviewing the jurisdiction order, we apply the substantial evidence standard, under which "we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding." (*In re T.V., supra,* 217 Cal.App.4th at p. 133.) "Substantial evidence indicates more than a smidgeon or trace; it must be meaningful and significant and cannot be merely speculative." (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 22

(*Ma.V.*).)

In sustaining count b-1 of the subsequent petition alleging mother failed to protect A.G. from father's physical abuse, the court relied on mother's history of violating the restraining order and allowing father access to A.G. Mother does not dispute that she previously violated the restraining order by granting access to father. However, she contends that there was no evidence at the time of the jurisdiction hearing to support finding that she would continue to do so. Thus, the court's jurisdictional finding that she failed to protect A.G. from father's physical abuse, mother asserts, is based on "speculation" and "stale" evidence. We agree.

By the time of the jurisdiction hearing, which took over the course of several days between February 3, 2021 and April 28, 2021, familial circumstances had undergone significant changes. As of March 3, 2020, A.G. had been removed from mother's care and placed in a foster home. The parents did have unauthorized phone communications in April and May. However, there is no indication that mother granted father access to A.G. after March 3 or communicated with him after May. The evidence showed that, with the help of services and therapy, mother continued to evolve and recognize that she was the victim of domestic violence. She also demonstrated an ability to assert boundaries and take steps to protect A.G. whenever father attempted to interfere in her and A.G.'s lives. For example, in November 2020 and April 2021, mother received phone calls or texts from an unidentified source and found items had been dropped off on her doorstep. Mother was uncertain whether it was father who called her or dropped off the items. Out of concern for A.G.'s safety who was at mother's house when some of the incidents occurred, mother reported the incidents to the Bureau and the police—an action she was unable to take in response to similar incidents

46

with father in the past. Mother also was cooperative throughout the Bureau's investigation into the allegations of abuse against father.

On April 15, 2021, less than two weeks before the final day of the jurisdiction hearing, the Bureau observed that mother "seems more confident and able to take actions that will ensure her child's safety," "is able to demonstrate that she understand how her life choices and actions have affected her daughter, [A.G.]," and "recognizes that her priority is to keep [A.G.] safe." The Bureau thus reported that "[t]he prognosis of [A.G.] returning to [mother] is excellent."

In light of the above, we agree with mother that her past conduct of allowing father access to A.G. had aged out by the time of the jurisdictional hearing. Thus, the juvenile court's focus on mother's past violations of the restraining order, which had not occurred again for at least ten months earlier, was error.

*Ma.V.* is instructive on this point. There, the Court of Appeal reversed the juvenile court's jurisdictional finding based on the allegation that mother's then-boyfriend twice perpetrated domestic violence against mother and that the mother let him back into her family home. (*Ma.V.*, *supra*, 64 Cal.App.5th at pp. 20, 22–23.) The court held that the findings were based on "stale" acts of domestic violence and neglect which had occurred 10 months earlier and had not been repeated. (*Id.* at pp. 22–23.) There, as here, because of delays due in part to the pandemic, the "[m]other had an unusually long amount of time before the jurisdiction hearing" to resolve "the key concerns warranting jurisdiction." (*Id.* at p. 23.) For example, she had no contact with her former boyfriend in the 10 months prior to the hearing and "recognized and verbalized she was a victim of domestic violence." (*Id.* at p. 23.) Thus, the reviewing court held the juvenile court erred in focusing on

mother's past victim of domestic violence, which had not occurred again during the 10 months the cases was pending and therefore did not demonstrate a current risk to the children. (*Id.* at p. 23.)

Here, as in *Ma.V.*, there was lack of substantial evidence at the time of the jurisdictional hearing of any risk of future physical harm due to mother's failure to protect A.G. Because count b-1 is not supported by the evidence and is not necessary to the court's findings of jurisdiction, we shall order the juvenile court to strike it.

### Disposition

Our conclusion that the jurisdictional finding as to mother on the subsequent petition must be vacated does not automatically entitle her to reversal of the dispositional order as to her because jurisdiction over A.G. is still valid by virtue of the remaining, affirmed findings against father. (See *In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492 ["A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established"]; *In re Briana V.*, *supra*, 236 Cal.App.4th at p. 311 ["The problem that the juvenile court seeks to address need not be described in the sustained section 300 petition. [Citation.] In fact, there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order"]; see generally § 362, subd. (a) [the juvenile court "may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child"].) Accordingly, we consider mother's challenges to the order of disposition on the subsequent petition.

Mother asserts that at the disposition hearing on January 3, 2022, the juvenile court erred in failing to make the required findings under section 361 on the subsequent petition. Section 361, subdivision (d) states in

relevant part: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody."

Here, the juvenile court expressly found "there's clear and convincing evidence of a substantial danger to [A.G.] should I return her to the care of either [parent], that is, to her physical health and/or her emotional well-being." Although mother acknowledges the court's finding tracks the language in section 361, subdivision (d), she argues that because the finding was made in the context of a combined disposition and review hearing, "it [was] clear the court was focused on and applying the review statutes and not the disposition one." Mother, however, does not point to any specific evidence indicating that the court confused the statutory requirements for disposition and review hearings or otherwise did not mean what it said. We thus conclude the court made the "substantial danger" finding in section 361, subdivision (d).

The juvenile court, however, did not expressly state whether "there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody." (§ 361, subd. (d).) But although it failed to do so, any error was harmless. As mother recognizes, the court's failure to make express findings may be excused if there is substantial evidence to support an implied finding.

49

(See *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218; *In re Clyde H.* (1979) 92 Cal.App.3d 338, 346–347.) Such evidence can be implied from the record.

As the bases for ordering the continued removal of A.G. from mother's care, the court expressly noted A.G.'s extreme emotional frailty, her "massive regression," which the court partly attributed to her exposure to her paternal relatives at her May 2021 birthday party, and her clinicians' opinion that A.G. could not be safely returned to mother at the time of the hearing. The court found the clinicians' opinion "timely and current." And it added that "[A.G.] is not safe in her state, not with her emotional needs."

In addition to the court's express concerns just described, other evidence outlined above disclosed that mother still struggled with drug use and stabilizing her mental and emotional health. And because mother refused to accept responsibility for her conduct, instead pointing blame at the Bureau, she did not take steps to address her relapse and mental and emotional instability.

We may infer from the totality of the record that the court did not believe there were reasonable means at the time of adjudication to safely return A.G. to mother until both she and mother made additional progress.

For this reason, mother's assertion that the court could have imposed alternative orders to removal is unavailing. Mother contends that the court could have permitted visitation between mother and the foster family. However, as noted, the court credited and adopted the clinicians' assessment that A.G. responded poorly to abrupt changes in her life. As an example, A.G. did not engage well with mother during their therapy sessions together, the likely reason being that A.G. found it confusing to suddenly attend therapy with mother after being used to attending therapy with her foster mother. To have ordered visitation between mother and the foster family

50

would have constituted the type of abrupt change that A.G.'s clinicians warned would have been detrimental to A.G.

Mother also argues that, as an alternative to removal, the court could have issued orders prohibiting contact between A.G. and her paternal relatives or any unvetted male individuals. We disagree. Mother previously received a similar directive from the Bureau not to leave A.G. unsupervised with her paternal relatives at her birthday party. But, as mother admits, she left that party, which, though not intended by mother, led to A.G. being left with her paternal relatives—a result that had significantly negative consequences on A.G.'s emotional well-being. Further, an order prohibiting contact between A.G. and any males who were not authorized by the Bureau to be present in mother's home would not have addressed the core impediments to mother's progress towards reunification.

Based on this record, the court could reasonably infer, based on a clear and convincing evidence, that a combination of services and monitoring that might, under different circumstances, provide a viable alternative to removal, would not sufficiently protect A.G. in this case.

### Additional Services

Mother's final argument is that that the juvenile court abused its discretion in failing to consider whether to order additional services at disposition on the subsequent petition pursuant to the procedure suggested in *In re Barbara P.* (1994) 30 Cal.App.4th 926 (*Barbara P.*).

In *Barbara P.,* the court held, "When the court later considers a subsequent petition alleging additional bases of dependency jurisdiction, further reunification services are not required in all cases. Failure to order additional reunification services after finding jurisdiction on a subsequent petition constitutes reversible error only if the particular facts of the case demonstrate an abuse of discretion in failing to order additional services.

Key factors in this determination would be whether the services already offered were adequate, whether they addressed the concerns raised by the subsequent petition, and whether the objectives of the reunification plan—the reunification of the family—could be achieved with the provision of additional services." (*Barbara P.*, *supra*, 30 Cal.App.4th at p. 934.)

While the juvenile court in this case did not articulate all of the findings suggested by *Barbara P.*, mother ignores "the general rule that an order or judgment of a trial court will be sustained, without regard to the reasons given by that court, if adequate grounds existed for the making of that order or judgment." (*West Pico Furniture Co. v. Superior Court* (1961) 56 Cal.2d 407, 413–414.) This rule also applies when the court fails to articulate its reasons, and we will presume appropriate findings if supported by the record. (See *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793, superseded by statute on another ground as stated in *In re Zacharia D.* (1993) 6 Cal.4th 435, 448.)

Here, mother does not argue that the services originally offered did not address the concerns raised by the subsequent petition or that those services were inadequate. (*Barbara P.*, *supra*, 30 Cal.App.4th at p. 934.) The only factor in *Barbara P.* that mother appears to address is "whether the objectives of the reunification plan—the reunification of the family—could be achieved with the provision of additional services." (*Id*. at p. 934.) In the present case, the juvenile court found there was not a substantial probability that A.G. would be returned to mother's custody, even if additional services were provided. Mother asserts this finding was not supported by substantial evidence, incorporating her arguments in support of a continuance under section 352. Those arguments, in turn, are predicated on evidence that mother completed many of the requirements of her case plan. We are

unpersuaded.

As explained above, despite mother receiving over two years of reunification services, she was unable to overcome the key problems that led to A.G.'s initial removal from her care. Additionally, she failed to accept responsibility for the troubling events in the months leading up to the combined disposition and review hearing that undermined her protective capacity. Given mother's demonstrated behavior, the juvenile court reasonably concluded that additional services would not have made reunification more likely. Instead, "[i]n such a case as this, additional reunification services would have added to the time that the minors were deprived of a stable and secure home." (*Barbara P., supra*, 30 Cal.App.4th at p. 934.)

## DISPOSITION

Father's writ petition is denied. Mother's writ petition is granted in part. Let an extraordinary writ issue directing the juvenile court to strike count b-1 alleged in the October 14, 2020 subsequent petition. In all other respects, mother's writ petition is denied. The juvenile court's original order terminating reunification services and setting the matter for a section 366.26 hearing remains in effect.

The stay of the section 366.26 hearing we previously entered on April 6, 2022 is lifted. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____
Richman, Acting P. J.

We concur:


_____
Miller, J.


_____
Mayfield, J. *


*M.G. et al. v. Superior Court* (A164320)

     *Superior Court of Mendocino County, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

54